```
 1   UNITED STATES DISTRICT COURT

 2   DISTRICT OF CONNECTICUT

 3
     UNITED STATES OF AMERICA,   )
 4                 Plaintiff,    )     NO: 3:18MJ1473(RMS)
                                 )
 5   vs.                         )
                                 )     October 24, 2018
 6   DANIEL JIMENEZ DE LA CRUZ,  )
                   Defendant.    )     Bond Hearing
 7   _____)

 8
                          141 Church Street
 9                     New Haven, Connecticut

10   B E F O R E:
             THE HONORABLE ROBERT M. SPECTOR, U.S.M.J
11
     A P P E A R A N C E S:
12
     For the Plaintiff :        JOHN TROWBRIDGE PIERPONT, AUSA
13                              United States Attorney's Office
                                157 Church Street, 25th Floor
14                              New Haven, CT 06510

15   For the Defendant:         TRACY HAYES, ESQUIRE
                                Federal Public Defender's Office
16                              265 Church Street, Suite 702
                                New Haven, CT 06510
17

18

19

20

21

22

23
     Transcriber:               Martha C. Marshall, RMR, CRR
24

25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
```

1          THE COURT:  Good morning.  You may be seated.

2          MR. PIERPONT:  Good morning, Your Honor.

3          MR. HAYES:  Good morning.

4          THE COURT:  We're here in the case of United States

5   of America versus Daniel Jimenez De La Cruz, and the case

6   number is 3:18MJ1473.  Is that the case number we're still

7   working off of?   Okay.

8          Could I please have appearances of counsel and

9   anyone seated with you at counsel table.

10         MR. PIERPONT:  Good morning, Your Honor.  Assistant

11  United States Attorney John Pierpont on behalf of the United

12  States.  Joining me at counsel table from DEA is Special

13  Agent James Kaskaman (ph).

14         THE COURT:  Good morning to you both.

15         MR. PIERPONT:  Good morning.

16         MR. HAYES:  Good morning, Your Honor.  Tracy Hayes

17  on behalf of Mr. Daniel Jimenez.

18         Your Honor, if I may, his family is also present,

19  his wife, Kimberly Jimenez, and his brother and his

20  sister-in-law, Michelle and -- I'm sorry --

21         THE COURT:  That's okay.

22         MR. HAYES:  -- for the family Jimenez.  They've

23  traveled from Pennsylvania, Allentown, Pennsylvania.  So I

24  just wanted to make that representation.

25         THE COURT:  Thank you for being here.  Thank you to

1    your family.  Good morning, Mr. Jimenez De La Cruz.  And

2    thank you to your family for being here to support you.

3         As you know, we're here for a bond hearing that was

4    requested by the defendant recently.  Am I correct?  I see

5    that there was a bond proposal filed or presented on October

6    11th via email, and then just sort of assuming from a report

7    I read that Probation was essentially researching that

8    proposal and when that was complete you asked for a hearing.

9    Is that fair?

10        MR. HAYES:  That's correct, Your Honor.

11        THE COURT:  And so before we begin, I just want to

12   make sure of a few housekeeping matters.  First of all, I

13   have in front of me both the original Pretrial Services

14   Report and the addendum which is dated October 16th, 2018.

15   Mr. Hayes, have you received both of those documents?

16        MR. HAYES:  So, Your Honor, when we first appeared

17   before the Court I didn't recall that there was one created

18   because it was sort of late in the day and we had another

19   matter before Your Honor that took up most of the time.  So I

20   haven't seen the original, but I have seen the addendum.

21        THE COURT:  I can tell you the original there

22   is -- the original is dated -- let's see, it's down here

23   somewhere -- September 27th.  And the information that is in

24   there is somewhat repeated in the addendum.  Certainly, the

25   addendum is far more detailed in the sense that Probation had

1   much more information by that time.

2           So why don't you just take a minute to look at the

3   original, because what I'm going to be asking is simply

4   whether the statements in the report are correct, whether

5   there's anything we should be adding or any additional

6   information that we should consider.

7           MR. HAYES:  Your Honor, actually, I've looked at

8   both of them.  I've considered both of them.

9           THE COURT:  And for Mr. Jimenez, do you prefer to be

10  called Mr. Jimenez, Mr. Jimenez De La Cruz, Mr. De La Cruz?

11          THE DEFENDANT:  Mr. Jimenez.  Jimenez is fine.

12          THE COURT:  Okay.  Mr. Jimenez, have you had a

13  chance to look at these two reports that I just talked about?

14          MR. HAYES:  So Your Honor may recall he speaks

15  English, but Spanish is his primary language.  So typically I

16  am reading to him.  So he knows of the reports.  He doesn't

17  know the first one, but I don't see where it necessarily

18  differs from what we know already.

19          THE COURT:  So is there anything -- addressing both

20  of you.  Is there anything that is missing from those reports

21  or that's in those reports that is inaccurate?

22          MR. HAYES:  Not inaccurate, but I do want to add

23  some information, if I may.

24          THE COURT:  Sure.

25          MR. HAYES:  So we've been working on this for some

1    time, myself with Mr. Jimenez and with his family, trying to

2    put together some type of package.  We weren't sure about his

3    employment in terms of finding something more steady, and we

4    have since done that.  There is a local store in his

5    community, in his neighborhood, where he previously worked

6    for some time.  He was laid off, if you will.  The person who

7    owns the store is actually a family member of Mr. Jimenez.  I

8    have not confirmed this myself because I just learned the

9    information this morning, but Mr. Jimenez can go back to the

10   store where he was working previously full-time.

11           I attempted to call the owner of the store, but he

12   also speaks, I believe, Spanish only.  So I couldn't reach

13   him since I received the information.  I knew about the

14   store, but we weren't certain that he could resume working

15   with the store.

16           THE COURT:  And can you tell me who owns the store?

17           MR. HAYES:  Yes, sir.  His name is Vidal.  And I

18   believe his last name is Baez, B A E Z.

19           THE COURT:  And what is his relationship?

20           MR. HAYES:  I'm sorry, Your Honor, I think that's

21   his cousin.

22           THE COURT:  His cousin?

23           MR. HAYES:  Yes, sir.

24           THE COURT:  And when did Mr. Jimenez work at the

25   store?

1          MR. HAYES:  So he stopped working there mid or early

2    summer.

3          THE COURT:  Okay.  Thank you.  Is there anything

4    else that you feel like needs to be changed or added to the

5    reports?

6          MR. HAYES:  I guess I should at least add this

7    information because I believe it's important.  Mr. Jimenez

8    just experienced the death of two family members.  When I

9    just, this was perhaps a month after this Court first met and

10   he appeared before Your Honor.  Both his father and his

11   brother passed away this August.  So his father passed away

12   August 5th and his brother passed away August 27th.  They

13   were both living in the Dominican Republic and Mr. Jimenez

14   was not able to attend any of the services.  But that

15   affected Mr. Jimenez.  One, not being able to attend the

16   services.  And, two, just the fact that people that were

17   close to him passed away.  To the extent that he was drinking

18   heavily since that time.  And so when we talked about that he

19   indicated to me that when he was arrested the agents observed

20   all these sort of empty bottles of alcohol in the apartment

21   and he talked about his drinking to the agents.  So I didn't

22   necessarily know that as well.

23          And I've met with Mr. Jimenez a couple of times

24   since we last appeared before Your Honor and spoken to him at

25   least once a week, at least.  But I didn't know any of that

1    information.  We had talked about other things.  So I want to

2    make that representation to the Court, because I think that

3    would add something else to what we would propose to the

4    Court in terms of finding some type of treatment for

5    Mr. Jimenez which might include mental health but, in

6    particular, to treat this addiction to alcohol as I think

7    that's important as well.  Again, even though I've spoken to

8    Mr. Jimenez and his family, that's not something that

9    Ms. Jimenez and I even talked about.  I just wasn't aware of

10   that until now.

11             THE COURT:  Thank you, Mr. Hayes.

12             Sorry, Mr. Jimenez, for your losses of both your

13   father and your brother.  And so this happened in August?

14             MR. HAYES:  That's correct, Your Honor.  August 5th

15   and August 27th.

16             THE COURT:  I don't want to assume the wrong thing,

17   but am I correct that in assuming that at that point he was

18   not allowed to leave the country because of his pending cases

19   or was it more just that he couldn't afford to go there?

20             MR. HAYES:  So Your Honor may recall, he's not here

21   lawfully so he just couldn't travel.

22             THE COURT:  So his concern would be he wouldn't be

23   able to come back.

24             MR. HAYES:  Yes.

25             THE COURT:  Okay.  Thank you.

1          Okay.  I'm going to turn to the Government simply to

2     talk about these reports and then we'll get into the

3     arguments.

4          MR. HAYES:  Thank you, Your Honor.

5          THE COURT:  Mr. Pierpont, have you had a chance to

6     review both the addendum and the original report?

7          MR. PIERPONT:  Yes, Your Honor.

8          THE COURT:  Is there anything from either of those

9     documents that you see that are inaccurate or missing?

10          MR. PIERPONT:  Not from the Government's

11     perspective, no, Your Honor.

12          THE COURT:  And can you remind me, Mr. Pierpont, is

13     this a case where there are victims that would have rights

14     under the Crime Victim Rights Act?

15          MR. PIERPONT:  So the Government has not identified

16     a victim in that circumstance, per se.  This is not an

17     overdose case or anything like this.  This arose out of, Your

18     Honor may recall, a duty matter where a search warrant was

19     executed at the residence and these things were found.  So as

20     of yet, the Government has not identified victims such that

21     they would need to be identified.

22          THE COURT:  Thank you very much.

23          So I'm going to turn back to Mr. Hayes to make your

24     arguments in favor of release.

25          MR. HAYES:  Thank you, Your Honor.

1          Your Honor, I believe that when we last appeared

2    before the Court there were two -- both prongs of detention

3    were stated by the Government, both the risk of danger and

4    the risk of flight.  So I want to at least start with -- I

5    understand that I do have the burden of production to

6    overcome the two.

7          I believe that we have, in terms of the package that

8    we've presented to the Court, and that includes a third party

9    custodian, any type of monitoring device if the Court deems

10   it necessary.  He, again, has found employment.  We can

11   verify that information.  Also, some type of treatment, I

12   think that's important as well.

13         THE COURT:  I'm sorry, can you just walk me through

14   the bond package proposal.

15         MR. HAYES:  Thank you, Your Honor.

16         So we first indicated that he would reside in

17   Waterbury, 10 Bronson Street, with his wife and his

18   infant -- their infant son.

19         When we first appeared before the Court, I think

20   this is important to mention, Judge, his wife was residing in

21   Florida.  I think we appeared on a Thursday.  I spoke to her

22   either Thursday night or Friday, and she indicated to me,

23   this was Friday morning, she indicated I will be on the first

24   plane and I will return immediately back for my husband.  She

25   did.  She was in Connecticut by Monday morning.  So we

1    started to prepare what would be a package.

2          She moved back into the apartment where he was

3    arrested.  So Mr. Jimenez can reside at that apartment in

4    Waterbury.  She would act as third party custodian.  When she

5    was in Florida, Your Honor, Ms. Jimenez was going through a

6    training program so she can obtain an insurance license so

7    she can start to work in the industry.  She's still trying to

8    work on that now since she's returned to Connecticut and find

9    other work as well.

10         The package would also include any type of

11   monitoring device that the Court deems appropriate here in

12   this case.  Also, he would work locally in Waterbury

13   full-time.  And I believe he was working at the time from 11,

14   a.m. to 11, p.m..  So he would resume those working hours at

15   the local store.  And if the Court believes that a curfew is

16   important here, we would abide by that.

17         That's, for the most part, our package, Your Honor.

18   And, again, I defer to the Court and to the Probation Office

19   in terms of any more of an appropriate package here.

20         THE COURT:  I think his family members traveled

21   here.

22         MR. HAYES:  That's correct, Your Honor.  I'm sorry,

23   I forgot to mention the signature bond.  I apologize.

24         THE COURT:  That's okay.  Go ahead.

25         MR. HAYES:  His family, his brother William and his

1   sister-in-law Michelle have traveled from Allentown,

2   Pennsylvania several hours this morning to appear in person

3   so that they could co-sign a non-surety bond in an amount

4   that the Court would deem appropriate, as well as his wife

5   Kimberly Jimenez who is also here.  And, of course, Daniel

6   will sign as well.

7          I think it sort of speaks for itself the importance

8   of having Mr. Jimenez out in the community with his family,

9   for his family to travel from Allentown, Pennsylvania, here,

10  to get here by 10:30 this morning because it's his family,

11  but they also know the risks of co-signing.  And they also

12  understand that they're trying to show the Court that he

13  won't flee.  He certainly doesn't show a risk of danger to

14  the community.  That's not who Mr. Jimenez is.  And that's

15  why they're here, to support Mr. Jimenez.

16         THE COURT:  Thank you.

17         MR. HAYES:  In terms of -- that's the package.  Does

18  the Court wish me to go over the risk of danger, risk of

19  flight?

20         THE COURT:  Well, I think what I would like to do

21  now, I'm going to turn to the Government, have the Government

22  make its argument, and then I'll turn back to you.

23         MR. HAYES:  Yes, Your Honor.  Thank you.

24         THE COURT:  Sure.

25         MR. PIERPONT:  So, Your Honor, the Government did

1    make a proffer last time we were here in September, but given

2    that we're here again and maybe it's been a little bit of

3    time, I guess I would just ask for the Court's indulgence as

4    I go over --

5             THE COURT:  I'd like that.

6             MR. PIERPONT:  -- go through the evidence one more

7    time.

8             THE COURT:  Thank you.

9             MR. PIERPONT:  As Mr. Hayes indicated, the

10   Government is seeking the presumption in this matter.  And

11   the Government does believe that Mr. Jimenez poses a danger

12   to the community and is a flight risk, and that there is no

13   combination of conditions that can satisfy those concerns.

14            And so from the danger of the community

15   perspective -- and, in fact, Your Honor, I have an exhibit

16   here.  If I may approach, Your Honor?

17            THE COURT:  Sure.

18            MR. PIERPONT:  This is just maybe put a little

19   context for the Court.  These are pictures that were executed

20   during the search warrant that was executed -- that were

21   taken, I'm sorry, during the search warrant executed at 10

22   Bronson.

23            THE COURT:  Before you keep going.  Mr. Hayes, is

24   there any objection to marking this as a full exhibit for the

25   purposes of this hearing?

1    MR. HAYES:  I guess my concern is this is the first

2  time that I've seen these items.  I know that the Government

3  emailed me, as I was sitting with Mr. Jimenez this morning,

4  what would be discovery in the matter.  But this is the first

5  time that I've seen them.

6    THE COURT:  So, Mr. Pierpont, can you just tell us,

7  as you were about to and I cut you off.  So if you could just

8  walk us through what each picture depicts.

9    MR. PIERPONT:  Yes, Your Honor.  I appreciate it.  I

10  did email them to Mr. Hayes this morning, and I appreciate

11  that he probably didn't have the opportunity to look at these

12  before today.  We are in the context of, you know, a bond

13  hearing so it's a little more liberal with respect to the

14  rules of evidence.

15    But to walk through what each of these pictures are,

16  by way of reminder, what was found during the execution of

17  the search warrant was a revolver, fentanyl, lactose, which

18  is something that is normally used to cut fentanyl, small

19  sandwich baggies, and north of $10,000 in cash.  And so what

20  we have here are pictures that were taken by Agent

21  Katzkametki (ph) during the execution of the search warrant

22  that I think helps orient the Court in terms of what I've

23  planned on talking about here today, which is, you know, what

24  I was going to proffer to in any event.

25    And so beginning at the first page, Your Honor, what

1    we have here is -- in the curtilage of the house or outside

2    the house, and this is just underneath Mr. Jimenez's bedroom

3    window, and there was sort of a secreted plastic trash bag

4    that was hidden behind a granite counter that was pushed up

5    against the house.

6          The second page shows the contents of that bag.  And

7    in that you can see small balled up powdery gray substance.

8    You can see the sandwich baggies.  You can see the handle of

9    the revolver, as well as the lactose bottle that is there.

10          The third page is the revolver itself, including

11   the fact that the bullets came out of the revolver.  So

12   loaded at the time that it was found.

13          The fourth page, Your Honor, are additional pictures

14   of another bag that was inside that plastic bag where there

15   was additional ammunition.

16          And the fifth page is a bedroom drawer, Your Honor,

17   where they found the cash.

18          So that's what composes Government's Exhibit --

19          THE COURT:  Can you tell me how much?

20          MR. PIERPONT:  It was just over 10,000.  If you'll

21   give me one moment, I'll find it.  $10,185, Your Honor.

22          THE COURT:  And are the photos that you gave us true

23   and accurate representations of the items as they we were

24   found that day of the arrest?

25          MR. PIERPONT:  Yes, Your Honor.

1              THE COURT:  Mr. Hayes, other than the fact that

2     there was a late disclosure to you, do you have any other

3     objection to me relying on the photos?

4              MR. HAYES:  No, Your Honor.

5              THE COURT:  So I'll admit these as Exhibit 1,

6     Defendant's Exhibit 1, I should say, for the purpose of the

7     hearing.

8              And so I think you were sort of in the middle when I

9     started asking about the pictures.  So you can keep going

10    with your proffer.

11             MR. PIERPONT:  Again, I think, Your Honor, the

12    purpose of these pictures is to illustrate what I'll be

13    proffering to you here, which is, in the first instance that

14    there was fentanyl that was found at the location.  And that

15    the fentanyl, along with the lactose and the quantity of

16    fentanyl, which I have another exhibit for Your Honor which

17    I'll get to in a minute, which is 63 grams of fentanyl that

18    was found there, along with the sandwich baggies and the

19    lactose suggest that, you know, what we have here is that

20    Mr. Jimenez was selling fentanyl.  He, after he was

21    Mirandized during the execution of the search warrant,

22    acknowledged and admitted that the items in that bag were

23    his.

24             And so from the Government's perspective, this

25    establishes pretty clearly that Mr. Jimenez is a fentanyl

1    drug dealer.  And that in the Government's view, and Your

2    Honor is well aware of the dangers of fentanyl, that tends to

3    demonstrate that he does pose a danger to the community.

4           The second point that I have --

5           THE COURT:  The 63 grams, is that a gross weight or

6    a net weight?  Meaning is that the lab weight or does that

7    include the packaging?

8           MR. PIERPONT:  That's the lab weight, Your Honor.

9    And I have here and, again, with apologies for the late

10   disclosure, I have here lab reports that I'd be happy to hand

11   up as an exhibit as well, subject to any objection that

12   Mr. Hayes may have.

13          THE COURT:  Based on the look on his face, I'm going

14   to guess he has an objection.  I don't need the live reports,

15   Mr. Hayes, as long as we're all in agreement that there's

16   about 63 grams of fentanyl found.

17          MR. HAYES:  And that's fine, Your Honor.  I'm sorry.

18   I'm not going to take up more of the Government's time.

19          THE COURT:  Let me just make sure I understand.

20          Is the typical use quantity for heroin/fentanyl

21   still about .02 grams?

22          MR. PIERPONT:  That's correct, Your Honor.

23          THE COURT:  And so the 63 grams that you just

24   mentioned is a lab weight of the substance inside the bags?

25          MR. PIERPONT:  That's right.  I believe there were

1    two bags.  You can only see one in this picture.  I'm looking

2    at the second page.  You can see one, but there were two bags

3    that had that substance, that gray powdery substance.  And

4    the lab weight is the quantity of those two bags.

5          THE COURT:  Sorry.  Go ahead.  Thank you.

6          MR. PIERPONT:  But the purpose, your Honor, is that

7    we're talking about a lot more than just a personal use

8    quantity that's at issue here.  And I think that that is

9    corroborated by the fact that you have the sandwich baggies

10   and the lactose there as well.

11         The second point, Your Honor, that we're looking at,

12   that the Government would raise, is the quantity -- the

13   amount of cash that was found on him.  Again, you know, that

14   is, suffice it to say, an atypical amount of cash for someone

15   to be keeping in their desk drawer and is typical as well of

16   somebody that has that quantity of cash that they are in the

17   business of buying and selling drugs.

18         The third point that I would raise, Your Honor, is

19   obviously the gun as well.  Again, Mr. Jimenez acknowledged

20   during the execution of the search warrant that the gun was

21   his.  He admitted to purchasing it from somebody named

22   Montero for $300.  And while, concededly, the Government

23   doesn't have at this time any further information about how

24   that transaction took place, you know, given the fact that it

25   was found in that plastic bag next to the drugs I think

1    speaks for itself for the fact that that was a weapon that

2    Mr. Jimenez was using either in furtherance or related to or

3    connected to the sale of fentanyl.

4            So from a danger to the community perspective, Your

5    Honor, I think that even without the presumption, although

6    the Government is invoking the presumption, there is a real

7    risk to the community here.

8            Then from the flight risk perspective, to switch

9    gears, Your Honor, you know, the Government, you know, did

10   run down Mr. Jimenez's information with the Department of

11   Homeland Security and there was no entry found, which I

12   understand to be for a non-U.S. citizen that that means he's

13   not here lawfully.  I think we heard Mr. Hayes concede as

14   much here today.  And on top of that, he made that admission

15   to Special Agent Katzkametki (ph) as well.

16           So the fact that he's not here legally or he's not

17   here lawfully is a concern for the Government.  To the extent

18   that, you know, he were to either run to the Dominican

19   consulate or maybe just take a train and go into New York

20   City and disappear into New York City and maybe make his way

21   back to the Dominican Republic in another way, the Government

22   is concerned about the fact that he is not a U.S. citizen.

23           I would add, Your Honor, you know, and I proffered

24   this a little bit before.  We heard a little bit about an

25   employment for this time, but the Government wasn't aware of

1    any employment.  I think I heard a little bit about or read

2    in here a little bit about him being a club promoter

3    occasionally.  But we don't see the ties to the community

4    here either that I think would assuage some of the

5    Government's concerns about him being a flight risk.  He had

6    been employed.  He's no longer currently employed.  We have

7    an unverified assertion that he could be employed if he was

8    let out.

9         His wife, who I understand is here in the courtroom

10   today, had been previously living in Florida.  In fact, he

11   had indicated during the search warrant that he lived at 10

12   Bronson Street by himself.  And, of course, while the

13   Government believes it's laudable that she has come up here

14   to support her husband, it does I think cut against the idea

15   that Mr. Jimenez has strong ties to the community.

16        From a -- your Honor, I know that one of the factors

17   you consider under the statute is the strength of the

18   evidence.  And so in addition to the lab reports that I

19   mentioned beforehand, we also have an ATF report here as well

20   that indicates that the gun itself was manufactured in

21   Massachusetts and some of the component parts came from

22   Illinois as well.  And so to the extent that I've already

23   talked about the evidence that he's not here lawfully and the

24   fact that he possessed a weapon and the fact that it came

25   from another state, in the Government's view, on that count

1    the evidence is overwhelming.

2         With respect to the possession with intent to

3    distribute.  Again, Your Honor, I've talked about the lab

4    reports.  You have the pictures here as well as the

5    defendant's admissions during the course of the search

6    warrant.  The evidence is very strong from the Government's

7    perspective.  And so to the extent that that is something

8    you're considering determining how to resolve this matter,

9    the Government submits the strength of the evidence suggests

10   that he is both a danger to the community and a flight

11   risk.

12        And finally, Your Honor, I'd like to turn to the

13   specific proposed package -- or actually let me stop there.

14   That's sort of the proffer about the general nature of the

15   offense.

16        THE COURT:  Well, I have a couple of questions that

17   I'll ask you and then it will probably address what you're

18   about to say about the package, and then I'll ask Mr. Hayes

19   the same question.

20        He now has three pending cases.  Is ICE planning to

21   put a detainer on him or not?

22        MR. PIERPONT:  I don't know the answer to that

23   question yet.  I don't know the answer, Your Honor.

24        THE COURT:  Okay.

25        MR. PIERPONT:  To the extent that a detainer was

1    lodged --

2            THE COURT:  And the reason I ask that question is

3    because the last thing anybody wants, including Mr. Jimenez

4    and his family, is for me to release him and then ICE to go

5    and arrest him.  That would be what I would think would be

6    the worst scenario that any of us want, because it would

7    involve agents going to his home again, it would involve a

8    destruction of his life, and to the extent that people have

9    signed documents, you know, traveled here.  So none of these

10   three cases it would be helpful.  For my purposes today, I

11   won't consider it one way or the other other than the fact

12   that, obviously, his citizenship status weighs into the

13   analysis about flight risk.  But it would be something

14   helpful I think to know.

15           And then the second question would be about the

16   pending cases themselves and how they impact the proposed

17   package.

18           MR. PIERPONT:  And addressing that point, Your

19   Honor.  I think one of the concerns, and I hadn't appreciated

20   that prior to reading the Pretrial Services Report and

21   addendum.  Suffice it to say, you know, I think sending

22   Mr. Jimenez to live with Ms. Jimenez, in light of some of the

23   history that we have here, it's a volatile situation, Your

24   Honor.  As I read it, I understand that both Mr. Jimenez and

25   Ms. Jimenez were arrested for domestic concerns or for

1    domestic assault concerns.  And, in fact, there was an order

2    of protection along the way that was issued that was

3    subsequently violated or at least allegedly violated.  And I

4    appreciate that these are pending charges, nothing has been

5    proven definitively one way or the other.  But I would

6    certainly be concerned about putting Mr. Jimenez into a

7    position where he's being set up to fail or potentially fail.

8            The second thing I would say is I'm not even -- the

9    Government is not sure what the conditions of the order of

10   protection for the underlying domestic case are.  I think

11   there's some indication, in speaking to the DEA prior to

12   this, they had looked at this previously.  Maybe it's a

13   partial order of protection, but maybe it's a full stay away.

14   And I think at this point the Government doesn't know that

15   answer.  And, certainly, to the extent that Mr. Jimenez was

16   going to live with Ms. Jimenez, if there's a full stay away

17   order of protection that's just not a viable solution because

18   that would be a violation right there.  So I think we at

19   least want to hear a little bit more about the nature of the

20   order of protection itself.

21           And I think, finally, to the extent that we're

22   talking about a toddler child as well who might be in that

23   circumstance, that would be a concern for the Government to

24   sort of exposing him any further to a potentially volatile

25   domestic situation.

1           I would add as well, Your Honor, that the proposed

2    package would have him back at the same residence where all

3    of this happened, where the search warrant was executed and

4    where these items were found.  And the Government is also

5    worried about Mr. Jimenez going straight back into the same

6    situation that he was just taken out of.

7           So in light of those ideas, Your Honor, certainly, I

8    think in light of the fact that while there are co-signers,

9    it's not as though there is property that's being put up or

10    something else that might give the Government some comfort.

11    Although, candidly, even if there were property, I'm not sure

12    my position would be different in this circumstance.

13           But in light of those things, in the Government's

14    view, the proposed conditions are insufficient to satisfy the

15    Government's concerns about Mr. Jimenez as a danger to the

16    community and his risk of flight.

17           THE COURT:  Thank you.  Mr. Hayes, you're free to

18    comment on anything that the Government said and my

19    questions.

20           MR. HAYES:  Yes, sir.

21           THE COURT:  Thank you.

22           MR. HAYES:  Can I at least start with the Government

23    first?

24           THE COURT:  You can start anywhere you want.

25           MR. HAYES:  I'm not going to give Mr. Pierpont a

1    hard time, but I mean if he got all this so-called evidence

2    he could have at least checked to see the conditions of the

3    protective order.  But I'll move on from there.

4         THE COURT:  Do you know what they are?

5         MR. HAYES:  I don't, Your Honor.  But as far as we

6    know, at least right now, they can live together.  But I

7    don't.

8         Let me at least start here in terms of what the

9    Government indicates in terms of the strength of the

10   evidence.  When we first appeared before Your Honor that was

11   important.  It was more important then than what we see now

12   two months later.  Now, how the Court needs to look at this

13   risk of danger is not what was found in his house and the

14   fentanyl.  According to what the Government indicates in

15   these photos, this stuff was found in trash bags outside of

16   the house, or, Mr. Jimenez admitted to owning these items.

17   So clearly either he's taken responsibility or he was trying

18   to get rid of these items or somebody was.  But either way

19   you want to look at it.

20        I'd ask the Court to consider now, today, two months

21   later, how the Court should review a risk of danger, in its

22   perspective, what will happen in the future.  So if we look

23   at Mr. Jimenez's criminal history, if you will, we have

24   pending matters prior to this case that would have been I

25   guess part of a diversion type of program since the classes

1    were completed, the family classes were completed, the

2    domestic violence classes.

3          So prior to that, he's lived in this community in

4    Connecticut for six or seven years with no criminal conduct.

5    I'd ask the Court to consider that.

6          We don't have previous drug charges, drug

7    convictions, or pending drug cases.  Nor do we have pending

8    firearm cases or past firearm convictions.  Nothing of that

9    nature.  Neither here nor in the Dominican Republic.  No

10   where.  I'd ask the Court to consider that.

11         So there's no real criminal history.  The matters

12   that we have that are pending are sort of on the shelf, if

13   you will, until 2019, when the couple will then appear in

14   state court and have these matters dealt with.

15         So in terms of risk of danger and any criminality,

16   if you look at his history, there's really nothing there.  If

17   you look at his future -- well, let's just look at his

18   history.  There's really nothing there.

19         His family's trying to work through their

20   relationship.  It is more telling that Kimberly Jimenez

21   drove -- not drove, I'm sorry -- flew here from Florida

22   within a matter of days.  I barely spoke to her on the phone

23   and she was here in Connecticut, where she's been for the

24   past two months trying to find employment, trying to care for

25   the family, care for the baby.  And she left a program, a

1    training program, that would have helped the family in their

2    future.  She left that program.  I think that's important.

3    That speaks to the relationship and sort of the undercurrents

4    of what the Government indicated in terms of their

5    relationship.

6           When we look at -- so I'll stay with the risk of

7    danger.  Again, Your Honor, those items were outside of the

8    house.  I do have to say when I looked at my notes from when

9    we first appeared before Your Honor and the Government

10   indicated where the gun was from, I know this because I just

11   read my notes, and then Mr. Jimenez mentioned this to me

12   earlier.  He said, and I think this is important, he said I

13   didn't say Montero.  If anything, I think he said moreno,

14   which means, you know, person of color, right, in Spanish.

15   And when I look at my notes, that's sort of how I wrote it

16   down earlier.  So say some person, specifically, I bought it

17   from that guy across the street.  Can't wait to get out

18   because I'm going to buy more guns from him and resume my

19   practice of selling drugs.  That's not what he said, because

20   that's not his background.  His family's not going to drive

21   several hours here if that were his background.

22          MR. PIERPONT:  And, Your Honor, let me interject

23   there.  Moreno is correct.  If I said Montero earlier, that

24   was incorrect.  Moreno is what I understood he said.

25          MR. HAYES:  Thank you.  So I'd ask the Court to

1    consider that.

2        There was a recent decision out of the 2nd Circuit.

3    I believe it was this -- from the Southern District of New

4    York, where a person with more serious charges than what we

5    see here, with the same presumption, was released by the

6    Magistrate Court.  And I do have the documents.  I was

7    reading them in preparation this morning, *U.S. v Ramon*

8    *Paulino*.  And, of course, I apologize for not bringing

9    copies, but the matter originally was 18MJ5372.  And that

10   matter was -- the matter, he was released in the Magistrate

11   Court and the Government appealed that to the District Court

12   before Judge Andrew Carter.  He was the -- the decision was

13   upheld in the District Court.  The Government then proceeded

14   to appeal that to the Circuit where they, as Mr. Gustafson

15   always says, putting more meat on the bones, that's what they

16   were looking for.  And so the District Court did that.  And

17   he, again, granted the release of this gentleman.

18       And the reason why I bring this matter up, Your

19   Honor, is because what indicates in this extensive order, if

20   you will, it's at least 32 pages, it talks about sort of how

21   we stop looking at defendants with the presumption of

22   innocence, because we talk about them and we hear about the

23   strength of the evidence.  We hear that all the time.  That

24   is the last of anything that the Court should look at, at

25   least here two months later.  That was sort of the premise of

1    his whole order.  And I'm not going to go into any more

2    details, but I think that's important.  It struck me at the

3    time.  And this order was filed in August of 2018 and it

4    still does today.  So I ask the Court to consider that.

5            When we, again, talk about the risk of danger, Your

6    Honor, where else is he going to go other than to the

7    apartment that he was arrested in.  What I would have loved

8    to have more than these photos and, again, this has nothing

9    to do with Mr. Pierpont, this is just what I would like to

10   have, is the search warrant -- excuse me -- yes, the search

11   warrant.  Would have loved to see that.  I can't wait to see

12   that.  That's important.  These items, we knew that from the

13   first day we appeared before Your Honor.  Nothing's changed,

14   not with what at the time.  But what has changed is we put

15   together a modest proposal for the Court which includes

16   members of his family, close members of his family, and

17   Mr. Jimenez himself, who are willing -- more than willing to

18   sign a bond.

19           Your Honor, there's no other place to go.  The

20   family's trying to get back together to get on their feet, so

21   to speak.  So I'd ask the Court to consider that.

22           When the Government indicates returning him right

23   back sort of where he came from.  Well, yeah, home.  That's

24   what we're asking.  He has no past, no pattern of

25   criminality.  Nothing like that was said, because there is

```
1    nothing.  If you -- and I think we should take the Government
2    at its word via the agents.  He admitted to some things
3    according to the Government.  What does that show?  Right?
4    So how I knew that he was here unlawfully was from the
5    Government, from their proffer from the first day.
6              I'm going to move to risk of flight.  I understand
7    the Government says that he has no real ties to the
8    community.  But he does.  He's lived here in Waterbury for
9    seven years.  He has an infant child.  The baby is now one
10   year and ten months.  His wife is there.  He has a cousin who
11   he will work with there.  What I just found out as well is
12   that his brother, who is present this morning, William
13   Jimenez, used to also live in Waterbury.  He owned another
14   store, grocery store, where Daniel Jimenez worked for two
15   years prior to his work with his cousin.  So, yeah, he has
16   ties.  Absolutely.  He knows people in the community.  He has
17   friends in the community.  He's a member of the community.
18   What he doesn't have is a criminal past.  He doesn't have
19   that type of background.  And I understand the concerns with
20   Homeland Security.  You know what I also wish we had today
21   was the video -- was their video from the execution of the
22   search warrant.  I would have loved to hear what he said, see
23   what they saw at the time.
24             THE COURT:  I just don't want to let this go by.
25   Are you saying you don't have access to discovery?
```

1          MR. HAYES:  Just got it today, Judge.

2          THE COURT:  I did continue the matter on your

3    motion.  I want to make sure that --

4          MR. HAYES:  I just got it.

5          THE COURT:  -- I'm not continuing this case for two

6    months and they're not --

7          MR. HAYES:  No, I don't mean to do that to the

8    Government.  The only reason I'm saying that, Judge, is

9    because --

10         THE COURT:  And if there's a video, there's a video.

11   If there's not, there's not.  But I want to make sure you

12   have access to all the information that you should have.

13         MR. HAYES:  Yes.  We just received that this

14   morning.  Again, this is nothing to do with Mr. Pierpont.

15   The only reason I'm saying that is because I wish we had that

16   today.

17         In terms of the Homeland Security, and I understand

18   where the Court's concern is at, and maybe perhaps even the

19   Government, having Mr. Jimenez released and sort of ICE or

20   Homeland Security agents go to the home, Your Honor, the

21   family has an immigration attorney.  I believe it's James

22   Welcome, who I spoke to about a month or so ago.  So they

23   have someone representing them which they had prior to this

24   matter.  So I'd ask the Court to consider that.

25         And I appreciate the Court's concern, but I think

1    it's more important to have him released from this and then

2    we get to the next matter, if there is even one.  So I'd ask

3    for the Court's consideration there.

4           Your Honor, I don't believe I have -- I understand

5    the Court may have some questions, but I don't believe I have

6    anything else.

7           THE COURT:  I don't.  But I'd like to take a brief

8    recess.  And Probation can just come back to Chambers

9    briefly.  We'll be back in 10 minutes.

10          MR. HAYES:  Yes, sir.

11          THE COURT:  Thank you.

12          (Recess.)

13          THE COURT:  Good morning.  You may be seated.

14          MR. PIERPONT:  Good morning, Your Honor.

15          MR. HAYES:  Good morning.

16          THE COURT:  So I am prepared to rule.  Does anyone

17   have anything else to add before I do that?

18          MR. HAYES:  No, sir.

19          MR. PIERPONT:  Nothing further from the Government,

20   Your Honor.

21          THE COURT:  Just give me one minute.

22          So, Mr. Jimenez, this is a difficult case and I want

23   to make it clear that the fact that your family's here to

24   support you weighs heavily in your favor.  If I was

25   considering different facts and they were here supporting you

1    that -- those facts, I would release the individual.  My

2    problem is that there are a number of facts that sort of come

3    together in this case that make it very difficult to come up

4    with a bond package.  Because I don't just take the bond

5    package you propose, I also think outside the box.  I think,

6    well, what if we add this or if we add that.  That's what

7    Probation does.  I mean, there will often be a case where we

8    think the bond package isn't sufficient but if we added GPS

9    monitoring, for example, if we added an inpatient treatment

10   program, you know, there are things we can add to a package.

11   So it's not as if you make your pitch and I say yes or no.

12   You make your pitch and I try to think outside the box and go

13   is there anything else we could add here to release you.

14         Here are the issues.  Starting with the Government's

15   case.  I take the case law that Attorney Hayes cited, despite

16   the fact that, you know, New York might think they're the

17   mother court, they're not binding precedent on Connecticut,

18   but I will take it as binding and take him at his word that

19   the case stands for the proposition that the sense of the

20   case is sort of the last factor to consider.  And it is.  It

21   is a strong case.  Why is it a strong case?  Because you

22   acknowledged and admitted that the stuff in the bag was

23   yours.  And inside the bag is 63 bags of fentanyl which, you

24   know, I'm sure you know this, but for the record, you know 50

25   doses to the gram.  So you times 50 by 60 and you get --

1           MR. PIERPONT:  300, Your Honor.

2           THE COURT:  Yes, I think it's 3000.  3000 doses.  I

3    think most people don't realize how many doses are in a gram

4    of fentanyl.  50 doses.  A bundle.  A bundle is 10 bags.

5    Five bundles to the gram.  So 50 bags to the gram.  You had

6    63 grams.  That's a lot.

7           The fact that there's a loaded firearm with the

8    drugs.  Serious conduct.

9           And the fact that there's $10,000 in cash inside the

10   house is further evidence along with your statements.

11          But what troubles me about the facts of the case are

12   the fact that you had two pending cases.  Okay.  In other

13   words, you've been released on two domestic violence cases in

14   early 2018.  And you've been released on essentially a

15   promise to do well.  The court is going to dismiss your case

16   if you go through the domestic violence program.  I think

17   you're scheduled for February of 2019.  So you're somewhat

18   under the microscope.  Is there a State Probation Officer

19   stopping by your house?  I imagine no.  But you're going to

20   go back in court at some point with the hope that those cases

21   are dismissed.  And so what troubles the court here is that

22   while this process is happening, while you're sort of waiting

23   for this year to go through, you commit the third offense.

24   So it's not the facts of the current offense.  It's the fact

25   that it happened while you are facing two other pending

1    cases.  Two other pending cases that could result in your
2    deportation.  A second degree assault could.  So I imagine
3    that's what went into the thinking of hiring an immigration
4    attorney.
5           And so it's troubling that you engage in serious
6    criminal conduct with a loaded firearm, with 63 grams of
7    fentanyl, with $10,000 in cash while you have those pending
8    cases.
9           But that doesn't mean detention's required.  It's a
10   factor to consider.
11          The other issue I think is your immigration status.
12   I am not going to consider whether ICE is going to put a
13   detainer.  That's not the issue.  It really isn't.  The issue
14   here is that because you're here unlawfully and because
15   you're from another country, there's always the concern that
16   you could flee.  And if those things weren't true and you
17   lived in Connecticut, for example, and you had a longstanding
18   presence in the community, for example, and you didn't have a
19   record and you were a citizen, there would be less of a
20   concern.  So it's not the fact of you're a citizen of the
21   Dominican Republic alone that means anything significant
22   other than it's one other factor that I have to consider.
23   Because if we get this wrong and you do leave, we're
24   not -- you're not going to be coming back.  The same reason I
25   think you probably didn't feel comfortable going to be with

1    your family in August is sort of the point, that if you do

2    leave this case that that's a risk that the Court has to

3    consider.  But, again, the right bond package could address

4    that.  The right bond package could address that issue.  Why?

5    Because you have no criminal record.  These are just arrests

6    from February and January.  They're not convictions.  And

7    other than committing this offense while on pretrial release,

8    you don't have any other record of committing probation

9    violations and you don't certainly -- I can presume you're

10   showing up to your court dates in state court because you

11   don't have any failures to appear.  So it's just one factor.

12          So I then have to kind of look in more detail at

13   your employment situation and your family situation.  And

14   what troubles me, if I'm looking at the addendum to the

15   Pretrial Services Report and what I think is true, it says it

16   here, is that Ms. Jimenez, your wife, relocated, essentially

17   left to live in Florida in May.  And you have these two

18   domestic violence cases pending involving her.  And so then

19   when she leaves in May and then she comes back, to her

20   credit, to support you in September, giving up a career path

21   to come back and support you.  While that shows incredible

22   character on her part, the Court has a concern.  Because I'm

23   presented with a Pretrial Services Report where you have two

24   separate domestic violence arrests involving her.  She then

25   leaves to live in Florida in May and she comes back in

1    September to support you.  And now I'm being asked to place

2    you in her custody, in the very same apartment where the

3    conduct occurred.  And that really is the crux of the

4    problem.

5         Some of what your attorney said in terms of

6    treatment, some of what your attorney said in terms of a job,

7    for example, are all in your favor.  But the first thing we

8    would need to figure out is a living situation.  And that

9    living situation is simply not going to work.  I would be

10   setting you up to fail.  I would be making your attorney and

11   your job much harder in your case by doing that.  Because if

12   anything happens, if the police were called to your house for

13   any reason, including disorderly conduct, suddenly you'd be

14   facing a bond revocation here and that would make your case

15   more difficult.  Because right now your case is simply these

16   pictures and the conduct and no bond violation.

17        So when I look at the -- I'm looking at the addendum

18   here talking about your relationship with her, the fact that

19   you've been together for four years, these two arrests, the

20   fact that she left to live in Florida and then came back to

21   support you, the issue is now you're asking me to make her

22   the third party custodian.  I agree a third party custodian

23   was necessary.  If you were to be released in this case, it

24   would be under the most stringent conditions which would

25   probably be house arrest.  But I don't think it's fair to

1    either one of you to put you in that situation in her custody

2    in her home.  And that's the issue.

3         So for that very specific reason, I don't think that

4    the bond package that has been proposed -- Probation, I think

5    that's what went into their recommendation.  We didn't get

6    into that during or when we were in here a few minutes ago.

7    But Probation has taken that position, that they're not

8    recommending release for that reason, that the living

9    situation is essentially untenable.

10        I'm not going to get into the employment situation.

11   If we were releasing you, I certainly would want more

12   information.  I'd want that employer in the courtroom.  I'd

13   want to hear from that employer as to when were you working

14   there, what you were doing, whether you were fired.  You

15   know, I'd want to more detail on that.  I didn't ask for that

16   because of the issue with the residence.

17        Okay.  So this order is obviously without prejudice

18   as, frankly, all of our orders are.  But that is my ruling at

19   least for today.

20        And I do want to recognize the fact that your family

21   came here.  I know they're frustrated dragging up here this

22   morning.  And I'm sorry that the result is not what you

23   wanted or expected, but I'm sure that their support means a

24   lot to you.

25        So anything further we need to do in this case?

1          MR. PIERPONT:  Not from the Government, Your Honor.

2          MR. HAYES:  Could I just have one quick question?

3    If we were to present some type of package to the Court,

4    knowing the family was actually here this morning and, in

5    particular, I'm talking about his brother and sister-in-law,

6    would the Court require they reappear or --

7          THE COURT:  No.  I mean, the people that would need

8    to appear are any proposed third party custodians.

9          MR. HAYES:  Thank you.

10         THE COURT:  Sure.

11         Anything else from Probation?

12         MS. AMATO:  No, Your Honor.

13         THE COURT:  We can stand in recess.

14         Thank you.

15         (Concluded at 11:54, a.m.)

16

17

18

19

20

21

22

23

24

25

1            C E R T I F I C A T E.

2

3         I, Martha C. Marshall, RMR, CRR, hereby certify that

4    the foregoing pages are a complete and accurate transcription

5    o the best of my ability of the electronic recording held in

6    the matter of UNITED STATES V. DANIEL JIMENEZ DE LA CRUZ,

7    which was held before the Honorable Robert M. Spector,

8    U.S.M.J, at 141 Church Street, New Haven, Connecticut, on

9    October 24, 2018.

10

11

12

13                              /s/Martha C. Marshall
                                Martha C. Marshall, RMR,CRR
14

15

16

17

18

19

20

21

22

23

24

25