# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:19-CR-00048 (KAD) |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| DANIEL JIMENEZ DE LA CRUZ | ) | JANUARY 7, 2022 |

### MEMORANDUM OF DECISION
### Re: AMENDED MOTION TO SUPPRESS, ECF No. 133

Kari A. Dooley, United States District Judge:

On February 20, 2019, Daniel De La Cruz Jimenez (the "Defendant") was indicted by a grand jury and charged with possession with intent to distribute a controlled substance, specifically, fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi), possession of a firearm in furtherance of a narcotics trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A)(i), and possession of a firearm by an alien illegally or unlawfully in the United States in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2). Pending before the Court is the Defendant's motion to suppress. Therein, the Defendant seeks to suppress tangible evidence seized from his residence on September 20, 2018 on the ground that the authorizing search warrant lacked probable cause in violation of the Fourth Amendment. He also seeks to suppress the statements he made to law enforcement officers at the time of the execution of the search warrant on the grounds that the statements were obtained in violation of his *Miranda* rights and the Fifth Amendment and were not otherwise knowing or voluntary even if no Fifth Amendment violation occurred. Initially, this latter argument was premised on the Defendant's inability to understand the *Miranda* warnings because they were given in English and the Defendant is a native Spanish speaker. By amendment to the motion to suppress, the Defendant also avers that his waiver of the right to remain silent was

not knowing and intelligent insofar as he was not competent to waive his *Miranda* rights, that is, he lacked the intellectual or cognitive capacity to understand the import of the *Miranda* rights or the consequences of waiving those rights by speaking with law enforcement. The Court heard evidence over several diverse dates, has considered all of the parties' submissions, to include post hearing briefs, and renders this decision based thereupon. For the reasons that follow, based on the more credible and weightier evidence, the motion to suppress is DENIED.

**The Evidence**

As to the Fourth Amendment claim,[1] there is no factual disagreement that in September 2018, the Drug Enforcement Administration ("DEA") was conducting an investigation into narcotics trafficking out of the DEA Boston office and in connection with that investigation learned of possible narcotics activity occurring in Connecticut. As a result, the New Haven division of the DEA was contacted and provided with the available information. On September 20, 2018, a search warrant application was presented to Magistrate Judge Spector for a search of the premises at 10 Bronson Street, first floor, Waterbury, Connecticut. Magistrate Judge Spector reviewed the application and authorized the search warrant, thereby finding probable cause to believe that the target premises, 10 Bronson Street, first floor, Waterbury, Connecticut, contained evidence of narcotics trafficking. The information contained in the search warrant application is discussed *infra*, as necessary to the analysis of the Defendant's Fourth Amendment claim that the warrant application failed to establish probable cause for the search.

---

[1] The Court did not take evidence on the Fourth Amendment claim as this claim was premised on the four corners of the search warrant application. And the Court has previously advised the parties that the motion to suppress premised on the alleged violation of the Fourth Amendment would be and in fact was denied. However, upon review of the record, the Court stands corrected as no ruling, from the bench or otherwise, has previously issued. This claim is therefore addressed herein.

As to the Fifth Amendment claims, an evidentiary hearing was necessary in light of the factual issues raised by the Defendant in his declaration filed in support of his motion to suppress. The Defendant's declaration indicates that the Defendant possesses a limited understanding of or ability to speak English. The Defendant also describes the events surrounding the execution of the search warrant. According to the declaration, at approximately 10:53 a.m. on September 20, 2018, the Defendant was startled awake by a loud noise at his front door, which turned out to be a team of law enforcement officers using a battering ram to breach the door. The Defendant avers both that he told the officers that he would open the door and that he subsequently opened the door for the officers. The Defendant next avers that after he opened the door, he was "slammed" to the floor of his living room before being handcuffed and taken to the kitchen, where he was ordered to sit down. According to the Defendant, two officers began talking with him as others searched his apartment and that, at that point, he did not recall any officers reading him his rights. The declaration indicates that the Defendant was then questioned while officers searched the house for more than an hour, and, eventually, an officer walked in with a garbage bag. Following the description of the officer's entrance with the garbage bag, the declaration indicates that the Defendant "was scared" and "did not know [he] could keep quiet," so he made statements to the officers. Lastly, the Defendant avers that "[f]inally, one of the officers told me my rights. At that point, I stopped talking, and the officers drove me to a police station." [2]

On March 13, 2020, the first day of the hearing on the motion to suppress, the Court heard testimony from Special Agent ("SA") Glen Coletti, who was present for the execution of the

---

[2] This declaration, while sufficient to trigger an evidentiary hearing, is hearsay. And while the Federal Rules of Evidence are not strictly applicable to suppression hearings, *e.g.*, *United States v. Mota*, 155 F. Supp. 3d 461, 468 n.4 (S.D.N.Y. 2016), they provide clear guidance as to the extent to which certain evidence should be relied upon, *e.g.*, *United States v. Gomez*, 495 F. Supp. 992, 1007 n.5 (S.D.N.Y. 1979) ("[T]here is no automatic rule against receiving hearsay evidence in suppression hearings in instances in which the trial court can accord such evidence the weight that it deems desirable."). Under these circumstances, as discussed *infra*, the Court will consider the declaration in light of foundational evidentiary principles.

warrant. He testified that, during the "knock and announce," he observed the Defendant through a window into the apartment, and that when the Defendant did not respond to the knock and announce, they used a battering ram to gain entrance. Approximately six officers entered with their firearms drawn. The Defendant was ordered to the ground, in English. The Defendant complied, and he was then handcuffed, picked up, and seated in a chair. At that point, SA Coletti testified that he asked the Defendant whether he understood English and the Defendant responded that he did. SA Coletti then read the Defendant his *Miranda* rights in English by reading DEA Form 13A to the Defendant. The Defendant indicated that he understood his rights and was willing to answer questions.

Thereafter, SA Coletti spoke with the Defendant for approximately 15 minutes in total, and because SA Coletti does not speak Spanish, he spoke with the Defendant in English. Among other statements, the Defendant acknowledged ownership of the gun and drugs located at the residence. He told SA Coletti that he stores the gun and drugs outside while he is sleeping. He also, initially, admitted that the currency found during the search, approximately $10,000, was his and that it was money he had saved. He later changed his statement and indicated that he was holding the currency for someone else. The Defendant told SA Coletti that an individual had brought "two owls," or *buho* statues to the home, that the Defendant took photos of the statues, and that the statues were no longer there.

SA Coletti testified that his conversation with the Defendant was not strained at all; that the Defendant's answers to his questions were on point and responsive; that he saw no indication that the Defendant did not understand him; that he was confident that the Defendant understood him; that he does not recall the Defendant ever asking him to repeat himself; that he does not recall that he ever needed to ask the Defendant to repeat himself; and that the Defendant was very calm

and cooperative. SA Coletti testified that he had a good rapport with the Defendant, was comfortable speaking with him, and hoped the Defendant would continue to cooperate with him. SA Coletti further testified that it is not unusual for him to encounter people who do not understand English, and, in those circumstances, he seeks the aid of an interpreter. During SA Coletti's testimony, the Government introduced into evidence his notes, made during the course of the execution of the search warrant. In those notes, SA Coletti wrote that the search team made entry at 10:53 a.m. and that the defendant was given his *Miranda* warnings at 10:57 a.m. The notes also reflect some of the details of the Defendant's statements. Additionally, the Government introduced as exhibits photographs from the execution of the search warrant through SA Coletti.

On cross examination, SA Coletti acknowledged that he did not ask the Defendant whether he preferred to speak in Spanish. He also acknowledged that he did not have the Defendant sign a written *Miranda* waiver form because, though normally his practice, he did not have such a form with him. Moreover, none of the original six officers who entered the residence spoke Spanish.

The hearing was adjourned and reconvened on July 17, 2020. On that date, the Court next heard from Special Agent James Keczemethy. SA Keczemethy was the affiant on the search warrant application. On the morning of September 20, 2018, after Magistrate Judge Spector authorized the search warrant, SA Keczemethy traveled to Waterbury, where the search of the residence was underway. When he arrived at 10 Bronson Street, Waterbury, Connecticut, he was advised that the Defendant had been given his *Miranda* warnings. SA Keczemethy then spoke to the Defendant who was still seated in the kitchen and secured with handcuffs. SA Keczemethy described the Defendant as polite and cordial. As SA Keczemethy does not speak Spanish, his conversation with the Defendant was entirely in English. SA Keczemethy asked the Defendant a series of question which the Defendant answered. The Defendant's answers were responsive to the

questions. SA Keczemethy described the Defendant's responses as "logical, they made sense." (Hr'g Tr. 129:18–21, ECF No. 96.) SA Keczemethy did not have difficulty understanding the Defendant, and the Defendant did not advise SA Keczemethy that he had any difficulty understanding SA Keczemethy. The Defendant did not tell SA Keczemethy that he did not speak English and did not ask for an interpreter. SA Keczemethy further described the conversation as "fluid" and without challenge. (*Id.* at 141:25.) He likened the conversation to the direct examination, "as you and I are speaking now." (*Id.* at 142:1–3.) He further testified that if he had any doubt about the Defendant's ability to understand English, he would have sought out the aid of an interpreter. As to the substance of his conversation with the Defendant, SA Keczemethy testified that the Defendant explained to him how he came to the United States. The Defendant advised SA Keczemethy that he travelled from the Dominican Republic to Panama. He then made his way north through Mexico to the U.S. border in a pickup truck. The Defendant told SA Keczemethy that he had paid $3,000 for passage to the U.S. border.

On cross-examination, SA Keczemethy acknowledged that he had not recorded his conversation with the Defendant; that he did not take notes of his conversation with the Defendant; that he did not himself give *Miranda* warnings; and that he did not see anyone else give the Defendant *Miranda* warnings. He testified that his written report of the interview was prepared the next day from memory. Also on cross-examination, SA Keczemethy testified that the Defendant did not appear to be scared or nervous and that SA Keczemethy did not perceive that the Defendant had urinated on himself. The Government rested.[3]

---

[3] Although not offered as exhibits, the Government also relies upon transcripts of proceedings held before a magistrate judge on three separate occasions. The first was from the Defendant's presentment before Magistrate Judge Spector following his arrest on September 20, 2018. (*See* Initial Appearance Tr., ECF No. 66.) The second was from the Defendant's bond hearing before Magistrate Judge Spector on October 24, 2018. (*See* Bond Hr'g Tr., ECF No. 67.) The third was from the Defendant's arraignment on March 13, 2019 before (then) Magistrate Judge Merriam following

The Defendant called Kimberly Jimenez as a witness. She is the Defendant's wife, though she testified that she has thought about getting a divorce in light of the Defendant's current legal trouble. Ms. Jimenez is originally from Puerto Rico though has lived most of her life in Florida or Connecticut. She is bilingual and speaks both Spanish and English. She testified that she and the Defendant generally speak Spanish with each other. She testified that the Defendant speaks "broken English" and that although he can converse with customers at his store in English in a basic way, he will often ask for help if he does not understand. She testified that he often required her assistance if, for example, they were with her friends who were speaking English. She testified that she highly doubts that he can write or read the English language. On cross-examination, Ms. Jimenez confirmed that the Defendant does generally ask for help if he does not understand something being said in English.

The suppression hearing was adjourned again following Ms. Jimenez's testimony in order to permit the Defendant to obtain a copy of the content of his seized telephone, as the Defendant requested the opportunity to review the content for evidentiary value in advance of deciding whether to testify. The disclosure and review of the Defendant's seized telephones (it was later revealed that there were two phones seized on September 20, 2018 rather than the one discussed on the second day of the suppression hearing) took several months. On November 24, 2020, a scheduling conference was held in part because the suppression hearing had not yet been concluded and in part because the January 2021 jury selection date was fast approaching. During this conference, the Defendant's counsel advised the Court and the Government that he needed time for an expert witness to meet with the Defendant and that he believed the Defendant was not able to knowingly waive his *Miranda* rights due to cognitive deficits. Thereafter, the Defendant

---

his Indictment on the instant charges. (*See* Arraignment Tr., ECF No. 68.) The content of the transcripts and their import to the Court's decision are discussed *infra.*

disclosed Dr. I. Bruce Frumkin as an expert who would opine that the Defendant did not have the cognitive ability to understand the import of the *Miranda* warnings or the consequences of waiving his rights and speaking to law enforcement. Litigation ensued regarding the sufficiency of the Defendant's expert disclosure and whether, if the disclosure was deficient, the expert should be permitted to testify. The Court ordered supplemental disclosures but permitted the expert to testify. All of the expert disclosures were either docketed or introduced into evidence at the hearing.

On August 24, 2021, the Court convened the third and final day of the suppression hearing. Dr. Frumkin testified for the Defendant. Dr. Frumkin's qualifications were not called into question. He is a board-certified psychologist specializing in forensic psychology, and he specializes in false confessions and competency to waive *Miranda* rights. Dr Frumkin first testified about his extensive background in forensic psychology as well as his experience as an expert witness. He testified that he has been used by the American Academy of Forensic Psychology to teach other psychologists how to do evaluations pertaining to disputed confessions and that he has published a variety of articles, book chapters, and encyclopedia entries concerning defendants' competency to waive *Miranda* rights. He has testified on *Miranda*-related issues specifically about one hundred times, though he has testified as an expert over 700 times. He works for both defense attorneys and prosecutors.

Dr. Frumkin then testified about the specifics of Defendant's case, including the procedures he used to accommodate Defendant's primary language, the tests that he administered to the Defendant and the results of those tests, how he tested for "malingering," and what the test results had to say about Defendant's competency to waive his *Miranda* rights. Specifically, Dr. Frumkin testified that he conducted an interview with the Defendant and administered, either completely or portions thereof, the Weschler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"); the

Comprehensive Test of Nonverbal Intelligence, Second Edition ("CTONI-2"); the Comprehension of Miranda Rights test ("CMR"); the Comprehension of Miranda Rights Recognition Test ("CMR-R"); the Function of Rights and Interrogation Test ("FRI"); the Spanish version of the Sixteen Personality Factor Test ("16PF"); the Validity Indicator Profile ("VIP"); and the Gudjonsson Suggestibility Scales ("GSS"). Dr. Frumkin ultimately testified that at the time the Defendant was questioned by police on the day of his arrest, he was not capable of making a knowing and intelligent waiver of his *Miranda* rights. Dr. Frumkin testified that he based his opinion on his interview of the Defendant and the test results. He testified that he did not believe that the Defendant was malingering, or purposefully trying to get answers wrong, principally because on the CMR-R test, the Defendant's scores were not lower than what might be expected if someone were using chance to arrive at their answers.

On cross-examination, Dr. Frumkin admitted that he had reviewed a number of documents in the Court's record, to include transcripts of the Defendant's arraignment and bond hearing as well as the Defendant's declaration which was attached to the original motion to suppress, but he further testified that these documents did not carry any weight in forming his opinion. Dr. Frumkin also stated that the Defendant knew the purpose of Dr Frumkin's interview—that the Defendant was meeting with Dr. Frumkin for the purpose of evaluating whether the Defendant understood his *Miranda* rights at the time they were given—and that Dr. Frumkin was unable to score the VIP test, which measures effort, because the Defendant did not complete all of the questions and needed to be redirected on several occasions. Dr. Frumkin's testimony will be discussed in greater detail as necessary.

The Defendant did not testify.

In rebuttal, the Government called Officer Anthony Tanganelli of the Waterbury Police Department. Officer Tangenelli testified, based upon a review of an incident report he had authored on January 6, 2018, that in the early morning hours of that same day he was called to the scene of a domestic dispute. The Defendant and his wife were both present and each had called 9-1-1 to report the other. Also present was a third party who did not speak English. As Officer Tanganelli did not speak Spanish, the Defendant provided translation services for Officer Tanganelli at the scene.

**Discussion**

### Fourth Amendment Claim

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . ." U.S. Const. amend. IV. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Therefore, "[i]n determining whether probable cause exists to support the issuance of a warrant, a judge must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Boles*, 914 F.3d 95, 102 (2d Cir. 2019) (internal quotation marks omitted). "To establish probable cause to search a residence, two factual showings are necessary—first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir.1983) (citations omitted).

A court reviewing an issuing judge's finding of probable cause "must accord considerable deference to the probable cause determination . . ." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir.

2007); *see also Gates*, 462 U.S. at 236 ("[W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts.") (internal quotation marks and citations omitted). The reviewing court's task "is simply to ensure that the totality of the circumstances afforded the [issuing judge] 'a substantial basis' for making the requisite probable cause determination." *United States v. Thomas*, 788 F.3d 345, 350 (2d Cir. 2015) (citing *Gates*, 462 U.S. at 238). Additionally, the issuing judge's "finding of probable cause is itself a substantial factor tending to uphold the validity of [a] warrant." *Travisano*, 724 F.2d at 345 (internal citations omitted). In the end, any doubts that remain "should be resolved in favor of upholding the warrant." *Id*.

Here, the application for the search warrant submitted on September 20, 2018 was supported by the affidavit by Special Agent James Keczemethy. (Gov.'s Ex. A, ECF No. 76-1.) Therein, the affiant averred that two days prior, on September 18, 2018, the DEA received information from a cooperating defendant that he had secreted 500 grams of "uncut" heroin in a small statue of an owl (or *buho*). The cooperating defendant explained that he had given this statue to "Daniel," a drug dealer he knew, on September 17th, while inside Daniel's apartment at 10 Bronson Street. Although the affiant acknowledged that the DEA had "not had the opportunity to fully test [the cooperating defendant's] reliability," SA Keczemethy also detailed how information from an out-of-district wiretap investigation had corroborated the cooperating defendant's account. (Gov.'s Ex. A at 4–5.)

In his motion to suppress, the Defendant contends that the search warrant was facially invalid because the supporting affidavit failed to establish probable cause to believe that evidence of any crimes would be discovered at 10 Bronson Street. He relies principally, though not entirely,

on the fact that the cooperating defendant was a complete unknown in terms of his reliability and that therefore it was unreasonable to rely on the cooperating defendant's statements and those statements could not therefore be used to establish probable cause. The Court disagrees.

The Defendant first argues that probable cause was lacking because the affidavit did not state that either the cooperating defendant or "Daniel" stashed, sold, or bought contraband at 10 Bronson Street. He further contends the cooperating defendant's assertion that Daniel sold drugs is on its own insufficient to establish probable cause. Whether or not this is accurate, the affidavit contains more than this conclusory accusation by the cooperating defendant. The affidavit stated that the cooperating defendant not only identified Daniel as a drug dealer but also reported that he personally gave Daniel the *buho* statue containing heroin while inside the first-floor apartment at 10 Bronson Street on September 17th. The cooperating defendant's presence at 10 Bronson Street on September 17 was corroborated by information received from T-Mobile. The affidavit further explained that the cooperating defendant's intercepted communications from September 17th were consistent with, and therefore also corroborated, this and other information provided by the cooperating defendant. For example, in one intercepted call, the cooperating defendant tells an unknown individual that he was going to Waterbury. In another, he identifies himself as being in Waterbury on "Bronson." Of significance, the cooperating defendant was not aware that his communications had been intercepted at the time of his interview so there was no opportunity for him to tailor his information to that which law enforcement already knew. Similarly, although not specific to 10 Bronson Street, the cooperating defendant's information on other subjects, *i.e.*, the arrival of an associate from Utah, was also independently verified, making reliance upon his information appropriate in the probable cause analysis. In short, the warrant application was not

based on a blind leap of faith as to the accuracy of the cooperating defendant's information as suggested by the defense.

Second, and relatedly, the Defendant argues that there was not probable cause to believe that the *buho* statue was still inside 10 Bronson Street at the time of the warrant application. The Defendant urges that the intercepted communications support the inference that the cooperating defendant brought the statue to another prospective customer on September 17, and therefore, there was good reason to believe it was no longer at 10 Bronson Street. Again, the Court disagrees. The cooperating defendant told authorities that Daniel was given the *buho* statue on September 17. The intercepted communications do not contradict this representation. They perhaps suggest that the cooperating defendant was still talking to other prospective customers at the same time. However, given that the cooperating defendant was arrested on September 18, there is no basis upon which to conclude that the *buho*—which purportedly contained a significant quantity of heroin—had been moved from 10 Bronson Street or delivered to a different customer following its delivery to "Daniel" on September 17.

Probable cause exists if "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Boles*, 914 F.3d at 102. Under the circumstances presented here, the issuing magistrate judge had a substantial basis for finding probable cause to search 10 Bronson Street for evidence, fruits, and instrumentalities of a drug trafficking offense and that determination is entitled to considerable deference. *Walczyk*, 496 F.3d at 157. The motion to suppress is, therefore, denied to the extent it seeks to suppress the tangible evidence obtained during the search of 10 Bronson Street on September 20, 2018.

While the Court does not consider this a particularly close call, even if reasonable minds might differ with respect to the probable cause analysis, the motion to suppress would be denied

based on the so-called good faith exception to the exclusionary rule, as established in *United States v. Leon*, 468 U.S. 897 (1984). The Court recognizes that there are several circumstances under which the good faith exception will not apply, *id.* at 922, but none of those are, in the Court's view, implicated here.

**Fifth Amendment Claims**

The Defendant also seeks to suppress the statements he made to law enforcement officers at the time of the execution of the search warrant on the grounds that the statements were obtained in violation of his *Miranda* rights and were not otherwise knowing or voluntary even if no *Miranda* violation occurred. "The Fifth Amendment guarantees that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" *New York v. Quarles*, 467 U.S. 649, 654 (1984) (quoting U.S. Const., amend. V). In *Miranda v. Arizona*, the Supreme Court took steps to protect this guarantee by recognizing that "custodial interrogations, by their very nature, generate 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely'" and by "impos[ing] on the police an obligation to follow certain procedures in their dealings with the accused." *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). The purpose of *Miranda*'s procedural obligation—the requirement to provide the well-known *Miranda* warnings before commencing a custodial interrogation—is "to ensure that the person in custody has sufficient knowledge of their constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *See United States v. Capers*, 627 F.3d 470, 474 (2d Cir. 2010) (quoting *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007)). Here, the parties agree that the Defendant was subjected to a custodial interrogation. The relevant inquiry

therefore is whether the Defendant was given his *Miranda* rights, and, if so, whether he knowingly, intelligently and voluntarily waived those rights.

The Government bears the burden of proving, by a preponderance of the evidence, both that *Miranda* warnings were validly issued and that the defendant's waiver of his rights was knowing, intelligent and voluntary. *See Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004) (citing *Colorado v. Connelly*, 479 U.S. 157, 169 (1986); *Brown v. Illinois*, 422 U.S. 590, 604 (1975); *Lego v. Twomey*, 404 U.S. 477, 489 (1972)). "*Miranda* conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Id.* at 608.

Where *Miranda* warnings are given, to prove a valid waiver the Government must establish "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran*, 475 U.S. at 421). Further, "[t]he question of waiver must be determined on the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir 2011) (quoting *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993) (per curiam)). "Coercive police activity . . . is a necessary predicate to finding that a waiver of *Miranda* rights was not voluntary." *United States v. Medina*, 19 F. Supp. 3d 518, 538 (S.D.N.Y. 2014) (quoting *Connelly*, 479 U.S. at 167) (other citations omitted). Even in the absence of coercive police activity, however, a *Miranda* waiver may be invalid if the defendant does not have the capacity to knowingly and intelligently waive his rights. *See Moran*, 475 U.S. at 421.

Here, the Defendant first avers that his statements to law enforcement should be suppressed because he was not given his *Miranda* warnings in advance of being interrogated by agents executing a search warrant at his residence, a position supported by the Defendant's declaration. The motion to suppress then raises the question of whether the Defendant, a native Spanish speaker, adequately understood the English language such that the reading of Miranda warnings to him in English, if they were in fact given, was sufficient for him to have knowingly and voluntarily waived his rights. Finally, the amended motion to suppress raised the additional issue of whether the Defendant was competent to waive his Miranda rights. The Court addresses each issue in turn.

### Whether the Miranda warnings were provided

The Defendant asks the Court to resolve the factual dispute as to whether the *Miranda* warnings were read to the Defendant prior to his interrogation in the Defendant's favor, a finding that would preclude the Government from using the Defendant's statements at trial. *See Seibert*, 542 U.S. at 608. The Court has little evidentiary basis upon which to do so, aside from the Defendant's assessment that SA Coletti is not to be believed. There was no evidence offered to contradict SA Coletti's testimony that upon securing the Defendant and having him seated in the kitchen SA Coletti asked the Defendant if he spoke English and that, when the Defendant answered in the affirmative, SA Coletti read DEA Form 13A containing the *Miranda* warnings to the Defendant.[4]

---

[4] "[B]y not testifying, defendant has failed to contradict the government's evidence . . . even though he might have done so without risk that anything he said could be later used against him at trial." *United States v. Mason*, 660 F. Supp. 2d 479, 491 (W.D.N.Y. 2009) (quoting *United States v. Juvenile Male*, 121 F.3d 34, 42 (2d Cir. 1997)). To be clear, the Court does not draw any adverse inference from the Defendant's decision not to testify. However, having so decided, he leaves much of the Government's evidence uncontradicted.

The Court finds this testimony credible and further observes that the testimony is consistent with SA Coletti's notes reflecting that the warnings were given approximately four minutes after entry upon the premises. In addition, the four-minute interval reflected in the notes is consistent with SA Coletti's testimony about the sequence of events leading up to the *Miranda* warnings, to wit, the security sweep of the premises and the securing of the Defendant at the kitchen table. Although the Defendant's declaration does not expressly contradict SA Coletti insofar as he merely avers that he does not recall being advised of his *Miranda* rights before being questioned,[5] the inference to be drawn from his statement that "[f]inally, one of the officers told me my rights" after the interrogation is that he had not previously been so advised. This assertion is rejected. The Defendant's self-serving declaration is untested by cross examination and contradicted by more credible evidence and testimony.[6] To the extent the Defendant seeks to suppress his statements on the ground that he was not advised of his *Miranda* rights, the motion is denied.

### *Whether the Defendant's waiver was made voluntarily, knowingly, and intelligently*

### Coercion

---

[5] The Defendant's declaration does directly contradict SA Coletti in regard to other matters, and those contradictions tend to further undermine the credibility of the Defendant's declaration. For example, the Defendant's declaration states that he opened the door for law enforcement while SA Coletti testified that law enforcement breached the residence's door with a battering ram. And while SA Coletti's testimony is corroborated by Government's Exhibit 3, which depicts the smashed and broken door, the Defendant's account is uncorroborated by physical evidence.

[6] In his post hearing brief, the Defendant assesses SA Coletti as "far from convincing" and challenges his testimony as the result of improper leading questions by the Government. (ECF No. 159 at 4.) In his reply brief, the Defendant also asks this Court to draw an adverse inference against the Government because SA Coletti did not record his interactions with the Defendant. Specifically, he argues: "Resolving this dispute in favor of the government would only embolden agents, assuring them that they do not need to record encounters because the Court will credit them even if their account is contradicted by the defendant's recollection." (ECF No. 160 at 2.) To be clear, the Court is not summarily crediting SA Coletti over the Defendant as implied by this argument. First, the Defendant did not even testify, and, as noted above, his declaration was untested on cross-examination. Second, also discussed above, SA Coletti's testimony is corroborated in several ways while the Defendant's declaration is undermined in several ways. Further, SA Coletti did not testify in a manner that presented as anything other than forthright, nor was his credibility undermined through cross-examination. In short, the Government, on this particular issue, has carried its burden to show that the Defendant was given *Miranda* warnings before any custodial interrogation. *See Medina*, 19 F. Supp. 3d at 539 ("Finally, the detectives' testimony on this point is entitled to more weight than Medina's affidavit, because—as previously discussed—it was subject to cross-examination and the detectives gave consistent testimony and appeared credible.").

The Defendant argues that the waiver of his *Miranda* rights was the result of force or coercion on the part of the law enforcement officers because the manner in which the search warrant was executed left him in a state of abject fear. The Defendant argues that the way that law enforcement entered the 10 Bronson Street apartment and detained him coerced or intimidated him into waiving his *Miranda* rights. Specifically, the Defendant relies on SA Coletti's testimony that law enforcement agents used a battering ram to break down the Defendant's door; that law enforcement agents, starting from a tactical stack, then entered the apartment with their guns drawn; and, finally, that the agents handcuffed the Defendant and placed him at his kitchen table. The Defendant also relies upon SA Coletti's testimony that he read the Defendant his *Miranda* rights four minutes after placing him in handcuffs.[7]

While these events were undoubtedly stressful, alone or in combination they do not rise to the level of creating so coercive an atmosphere such that the Defendant's will was overborn by law enforcement. *See United States v. Theriault*, No. 8:07-CR-200 (GLS); 2008 WL 942568, at *5 (N.D.N.Y. Apr. 7, 2008) (finding no coercion even though special response team had breached defendant's home with "an overwhelming show of force"); *United States v. Villaverde-Leyva*, No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11–*12 (N.D. Ga. Dec. 9, 2010) (finding *Miranda* waiver was not coerced even though defendant had been handcuffed, confronted by eight to ten government agents with guns drawn, and forced to wait for two hours—while guarded—before being questioned); *Guadarrama v. United States*, No. 2:15-CV-203-JRG, 2016 WL 3574403, at *5 (E.D. Tenn. June 23, 2016) (finding that defendant's will was not overborne even though defendant alleged that he was outnumbered by FBI agents who had their guns drawn and

---

[7] To the extent the Defendant relies upon the Defendant's statements to Dr. Frumkin on this issue, those statements are given little weight. They are self-serving hearsay, untested by cross-examination and are without corroboration in the record evidence.

were screaming at him when the FBI agents entered his apartment). Further, this argument is purely speculative as there is no testimony or evidence from the Defendant that he felt coerced or compelled to answer the officers' questions due to these circumstances. To the contrary, the credible testimony of both SA Coletti and SA Keczemethy reveals that the interactions between the Defendant and the officers was calm, cordial and polite. The Court concludes that the Defendant's statements were not the result of coercive measures.

### The Language Barrier

The Defendant next asserts that his statements, even if they followed *Miranda* warnings, which the Court has found to be the case, were not knowing or voluntary because he does not speak English well enough to have understood his rights prior to answering questions. However, the evidence regarding the Defendant's ability to communicate effectively in English establishes conclusively that the Defendant is sufficiently conversant in the English language and this purported language barrier is not, therefore, a basis upon which to find that his statements were not voluntary or knowing.

It is well settled that, in the Second Circuit, limitations on English language skills do not preclude a defendant from knowingly and voluntarily waving his or her *Miranda* rights. *United States v. Koshkin*, No. 3:19-cr-00251 (MPS), 2021 WL 268885, at *9 (D. Conn. Jan. 27, 2021) (citations and quotations omitted). A language barrier may prevent a defendant from making a knowing and intelligent waiver, but fluency in English is not a prerequisite to waiving *Miranda* rights in English. *See Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) (finding a knowing waiver where *Miranda* warnings were given in English even though the defendant "spoke in broken English with an accent and occasionally lapsed into Spanish"); *see also United States v. Toney*, 579 F. Supp. 652, 656 (S.D.N.Y. 1984) (finding that a Spanish-speaking defendant

knowingly waived his *Miranda* rights after he represented that he understood English); *Koshkin*, 2021 WL 268885, at \*9–\*10 (finding a waiver of *Miranda* rights knowing, intelligent and voluntary even though the Russian-speaking defendant alleged he knew only "limited" English); *United States v. Richardson*, No. 09-CR-874 (JFB), 2010 WL 5437206, at \*4 (E.D.N.Y. Dec. 23, 2010) (collecting cases); *United States v. Ho*, 930 F. Supp. 858, 864 (W.D.N.Y. 1995) (collecting cases).

In keeping with the totality of the circumstances analysis for evaluating *Miranda* waivers, the Court may consider a number of factors when determining whether a defendant sufficiently understands the language in which the *Miranda* warning was given. *See United States v. Ibrahim*, 998 F. Supp. 2d 12, 17–18 (N.D.N.Y. 2017) (considering, among other factors, whether the defendant spoke to investigators in English and the appropriateness of the defendant's answers to those questions, whether the defendant ever requested an interpreter, whether the defendant made written representations to the court, whether the defendant had resided in the United States and for how long, and whether the defendant signed a *Miranda* warning). As described above, both SA Coletti and SA Keczemethy testified that their interactions and conversations with the Defendant presented no language barriers or challenges. Neither agent perceived any indication that the Defendant did not understand what they were saying and neither had any trouble understanding the Defendant, who was speaking to them in English. Indeed, both special agents managed to have fairly detailed conversations with the Defendant. In his conversation with SA Keczemethy, the Defendant described his passage from the Dominican Republic to Panama, through Mexico (in a pickup truck) to the U.S. border, passage which cost him $3,000. Likewise, the Defendant told SA Coletti about his dealings with "Javito" and a "Salvadorian gentleman" who had dropped off "two owls" in early morning hours Monday. The Defendant further explained that he had taken photos

of the owls and that he had forwarded them to an unknown subject in the Dominican Republic. The Defendant also explained why the gun and drugs were located in a bag outside of the residence, and he described his purchase of the gun for $300 from an individual who obtained the gun in North Carolina. The Court credits the testimony of SAs Coletti and Keczemethy summarized above, that the Defendant was conversant in English and did not give any indication, express or otherwise, that he did not speak English or understand the officers. [8]

The Court's conclusion is further supported by the three transcripts from the Defendant's presentment, bond hearing and arraignment before Magistrate Judges Spector and Merriam. On September 20, 2018, the Defendant was arrested following the execution of the search warrant and presented before Magistrate Judge Spector later that same day. The Court first advised the Defendant regarding his right to remain silent, which the Defendant stated he understood. He was then told that "if you choose to make a statement, you should know that anything you say can and probably will be used against you either in this case or in any other case." When asked if he understood he replied "Yes, yes." (Initial Appearance Tr. 4:7–11.) The magistrate judge then turned his attention to the appointment of counsel, at which point defense counsel advised the judge that English is the Defendant's second language and that there was a bit of a language barrier with respect to the completion of the financial affidavit required for appointment of counsel. The Court then asked the Defendant, "Mr. De La Cruz, do you feel like you can understand me?" to

---

[8] The Defendant's own declaration corroborates the special agents' testimony. It is undisputed that none of the officers during the search spoke Spanish, yet the Defendant articulates with specific detail what those offers said to him, in English, during the search: "The officers ordered me to sit down;" "One of the officers told me I was not under arrest;" "[A]n officer told me 'you know why we're here;'" "The officers then said, 'How about if I told you we followed that person from New York to your house;'" "One of the officers strongly requested for the password to my cellphone;" "Another officer said 'we know everything, or we would take fingerprints;'" "He added, 'son we can help you, and negotiate something;'" and "Finally, one of the officers told me my rights. At that point, I stopped talking, and the officers drove me to a police station." Thus, many months after the events in question, the Defendant was able to recall precisely what was said to him, in English, by the law enforcement officers on scene. The Court recognizes that the declaration was likely drafted by counsel. But many of the statements included are direct quotes of what the officers said to the Defendant. The source of those quotes can only be the Defendant.

which the Defendant responded, "Yeah, I understand." (*Id.* at 5:1–3.) The judge then explained that because he is entitled to counsel at every stage of the proceedings, "if for some reason [Attorney Hayes] is unable to represent you in the future, the Court will make sure to find new counsel for you. Okay?" The Defendant responded, "Thank you." (*Id.* at 5:12–16.) The judge then explained the Defendant's right to have his consulate notified of his arrest and told the Defendant "You should discuss that matter with Mr. Hayes to decide if that's something you want to do. Okay?" The Defendant responded "Yes, sir." (*Id.* at 6:6–13.) Thereafter, Judge Spector further engaged with the Defendant to ensure his ability to understand the proceedings. Judge Spector inquired as to the Defendant's age, education level, and whether he had recently used alcohol or drugs which might make it difficult for the Defendant to understand the Court proceedings. The Defendant answered all of the Court's questions and indicated that his mind was clear. Finally, Judge Spector asked the Defendant whether he was having "any trouble understanding me?" to which the Defendant responded "No." (*Id.* at 8:2–4.) In sum, the transcript from the same day the search warrant was executed reveals the Defendant conversing in English in much the same way as was described by SA Coletti and SA Keczemethy.

The transcript from the bond hearing held before Judge Spector on October 24, 2018, likewise, was conducted entirely in English and offers no indication that the Defendant did not understand the proceedings. By way of example, Judge Spector asked the Defendant, "[D]o you prefer to be called Mr. Jimenez, Mr. Jimenez De La Cruz, Mr. De La Cruz?" to which the Defendant responded "Mr. Jimenez. Jimenez is fine." (Bond Hr'g Tr. 4:9–11.) And when Judge Spector asked the Defendant whether he had read the two pretrial services reports prepared in support of the bond hearing, defense counsel reminded the Court that there is a language barrier

with respect to written materials (much like the financial affidavit discussed during the Defendant's initial appearance) and told the Court that he had read the report to the Defendant.

Finally, the Court considers the transcript from the post-indictment arraignment on March 13, 2019. Initially, Judge Merriam reviewed the Defendant's right to remain silent, the Government's ability to use his statements against him, and the Defendant's right to counsel. As was the case on September 20, 2018, the Defendant indicated that he understood each of these rights. The Defendant was also able to answer the Court's questions regarding his age, education and whether he was receiving any medical treatment at the detention facility. When asked whether there was anything about his medical treatment that would make it difficult for the Defendant to understand Judge Merriam, defense counsel raised the fact that English is the Defendant's second language. Judge Merriam then advised the Defendant that the Court could arrange for an interpreter and asked whether that was his preference. The Defendant never directly stated his preference—replying only with a question: "Right now?"—and following a colloquy between counsel and Judge Merriam, the arraignment was postponed until such time as an interpreter could be secured. (Arraignment Tr. 6:8–9:17.)

But nothing in the post-indictment arraignment transcript undermines the testimony of SA Coletti and SA Keczemethy or calls into question the Defendant's ability to communicate in English as revealed at the prior hearings. Prior to utilizing an interpreter, the Defendant repeatedly represented that he understood proceedings that were occurring in English, and the Court's review of the evidence demonstrates that the Defendant's earlier representations should be taken at face value. In any event, the Defendant's reliance on an interpreter in later court proceedings does not undermine a conclusion that the Defendant understood his *Miranda* rights when they were read to him in English. "Comparing the complexity and breadth of what is typically done and said in the

courtroom with what is involved in the *Miranda* warning, limited English skills may suffice to understand the latter but not [the] former." *United States v. Granados*, 846 F. Supp. 921, 925 (D. Kan. 1994).

The Court finds that, at the time SA Coletti read the Defendant his *Miranda* rights on September 20, 2018, the Defendant understood English sufficiently well to both understand and waive his *Miranda* rights. Accordingly, to the extent the Defendant seeks to suppress his statements on the ground that he did not understand his *Miranda* rights because they were read to him in English, the motion is denied. *See Campaneria*, 891 F.2d at 1020; *see also supra* at 19–20.

### Whether the Defendant was competent to waive his *Miranda* Rights

In order to execute a valid waiver, the accused need not know and understand every possible consequence of waiving his Fifth Amendment privilege: It is enough that the accused is aware that "he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *United States v. Guzman*, 879 F. Supp. 2d 312, 320 (E.D.N.Y. 2012) (quoting *Colorado v. Spring*, 479 U.S. 564, 574 (1987)). A defendant's limited cognitive ability may play a role in determining whether the requirements of a waiver have been met, but courts have generally concluded that no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving the constitutional rights protected by *Miranda*. *See United States v. Murgas*, 967 F. Supp. 695, 706 (N.D.N.Y. 1997) (quotations and citations omitted); *see also Toste v. Lopes*, 861 F.2d 782, 783 (2d Cir. 1988) ("A waiver of the right to remain silent is not invalid merely because a defendant is of limited mental capacity."); *Moore v. Dugger*, 856 F.2d 129, 132 (11th Cir. 1988) (finding a waiver valid where the defendant had an IQ of 62, functioned at the level of an eleven-year old, and was classified as mentally handicapped); *Garner v. Mitchell*, 557 F.3d 257, 264 (6th Cir. 2009)

(citing cases). The inquiry remains a fact-intensive one, and "short of the level of absolute incapacity," low intelligence—and even identified mental handicaps—are but part of the totality of the circumstances to be examined in deciding whether a waiver was knowingly made. *Hibbert v. Poole*, 415 F. Supp. 2d 225, 240 (W.D.N.Y. 2006) (quotations and alterations omitted).

The Defendant's argument on this issue—whether he was competent to knowingly and intelligently waive his *Miranda* rights—rests primarily on the expert opinion of Dr. Frumkin. Based upon his forensic interview of the Defendant and the results of the scorable tests administered to the Defendant, Dr. Frumkin opined that the Defendant did not, under the circumstances, have the ability to process the nuanced concepts embodied in the *Miranda* rights and did not have the intellectual capacity to understand the consequences of waiving those rights. As he described the situation, the *Miranda* warnings would have gone in one ear and out the other, with little or no understanding on the part of the Defendant. They were "words without meaning." (Expert's Disclosure, Gov.'s Ex. 17A at 5, ECF No. 158-19; Hr'g Tr. 261:17–262:22, ECF No. 155.) Accordingly, he opined that the Defendant was not competent to knowingly and intelligently waive his *Miranda* rights. Although the Court accepts that the Defendant may face some cognitive or intellectual challenges, for the reasons that follow, the Court rejects the conclusion reached by Dr. Frumkin that these challenges rendered the Defendant incapable of understanding his *Miranda* rights or incapable of knowingly and intelligently waiving those rights.

First, Dr. Frumkin's opinion is based, in part, on faulty or unproven factual predicates. For example, Dr. Frumkin describes the Defendant as having a very limited ability to speak and understand English, an assertion discussed above and rejected. Specifically, Dr. Frumkin opined "[The Defendant's] English skills are so deficient that although he can engage in simple, conversational English, oftentimes masking what he does not know, he is unable in English to

assess what the warnings mean." (Expert Disclosure, Gov.'s Ex. 17A at 5.) Dr. Frumkin's understanding of the Defendant's English skills, like the majority of his opinions, was necessarily premised on the Defendant's presentation of himself. Dr. Frumkin's assessment may accurately reflect his interactions with the Defendant, but the record provides ample basis to question the integrity of the Defendant's presentation. Likewise, Dr. Frumkin also bases his opinion in part on the very heightened state of anxiety the Defendant felt at the time of the execution of the search warrant. Again, Dr. Frumkin simply credits the Defendant's statements, to include the statement that he was so scared he urinated on himself. But the Court has little evidence to support this assessment. SA Coletti and SA Keczemethy both testified that the Defendant was calm, polite, cordial and cooperative. SA Coletti had no recollection of the Defendant urinating on himself.

Dr. Frumkin was also very dismissive of the record evidence that tended to undermine his conclusion. For example, Dr. Frumkin testified that the hearing transcripts discussed above, and the testimony of SA Coletti and SA Keczemethy, though included in the materials he reviewed, were irrelevant to his conclusions. As a result, Dr. Frumkin did not consider whether they undermined his assessment of the Defendant's ability to communicate in English or understand his constitutional rights, and he relied instead entirely on the Defendant's interview and test scores. Perhaps more problematic, Dr. Frumkin testified that the transcripts from the court proceedings were irrelevant because people sometimes say they understand something when they really do not.[9] He cited three reasons for this phenomenon. First, the person might think they understand but they do not; second, the person might know they do not understand but are embarrassed to

---

[9] The implication of Dr. Frumkin's testimony is striking. According to Dr. Frumkin, judges who advise defendants of their constitutional rights on a daily basis cannot reasonably rely upon the defendants' answers to the courts' questions to determine whether those rights are fairly understood because the answers are irrelevant to that inquiry. *Cf. Saddler v. United States*, 531 F.2d 83, 86 (2d Cir. 1976) (finding that, when it comes to evaluating a defendant's competency to plead guilty, the court is entitled to rely on a defendant's "rational and coherent" responses).

admit they do not understand; and third, the "demand characteristics" cause people of lower intelligence to avoid saying they do not understand something because it makes them look bad. (Hr'g Tr. 276:7–277:2, ECF No. 155.) Dr. Frumkin does not however tie these speculative possibilities to the Defendant so as to justify his discounting of the transcripts and all that they suggest. Indeed, there is no indication that Dr. Frumkin discussed the transcripts or the proceedings with the Defendant at all in an effort to understand why the Defendant said what he said, appeared to be so conversant in English, and stated that he understood his constitutional rights.

Further, as discussed, Dr. Frumpkin's opinion relied almost exclusively on his interview with the Defendant and the Defendant's performance on the various psychological tests. But the circumstances of this case raise concerns about the validity of the Defendant's input into the evaluation. First, the suppression hearing was well underway when Dr. Frumkin was retained, and the Defendant understood that Dr. Frumkin was going to do an evaluation to see if the Defendant understood his Miranda rights. Implicit in this understanding is that if Dr. Frumkin determined that he did not adequately understand his *Miranda* rights, he might prevail on the motion to suppress his statements. Notably, the primary test administered to determine the validity of the Defendant's effort and input could not be scored because the answer sheet did not match the question booklet. Dr. Frumkin dismissed this as the result of the Defendant's lack of concentration and need to be redirected—both by-products of his cognitive limitations. Indeed, Dr. Frumkin did not further test for malingering, despite other indications within the forensic evaluation that might have raised those concerns. For example, on the CTONI-2 test, the Defendant answered some of the easier questions incorrectly, and some of the more difficult questions correctly. Indeed, Dr. Frumkin noted that the Defendant's results on this test were likely below the actual level of the Defendant's

functioning in the real world. By Dr. Frumkin's own account, both of these factors could be an indication of malingering.

Finally, Dr. Frumkin's testimony concerning the Defendant's declaration is troubling to the Court because it illustrates his unwillingness to consider evidence at odds with his conclusion. The Defendant's sworn declaration recounts the sequence of events on September 20, 2018 from his perspective. Specifically, Defendant claims: "Again, I was scared. I did not understand I could keep quiet, so I made statements to the officers. . . . Finally, one of the officers told me my rights. At that point, I stopped talking and the officers drove me to a police station." By his own words and deeds as described in the declaration, the Defendant appears to have understood his rights (delivered in English) and acted in accordance with that understanding.[10] The Defendant's declaration is therefore difficult, if not impossible, to reconcile with an opinion that he did not have the language or cognitive ability to understand his *Miranda* rights or the import of waiving those rights by making statements to law enforcement.

When asked about the Defendant's sworn declaration at the hearing, Dr. Frumkin indicated that the declaration did not change his opinion as to whether the Defendant was capable of knowingly and intelligently waving his *Miranda* rights. On this question, the following colloquy occurred between AUSA Pierpont and Dr. Frumkin:

> Q: One of the Miranda rights involves the right to remain silent; right?
>
> A: Yes.
>
> Q. Okay. And, so, according to the Defendant's sworn statement, once he was read his rights, quote, "at that point" he stopped talking; right?

---

[10] Although the Court has found, as a factual matter, the Defendant was advised of his *Miranda* rights much earlier, such a finding does not undermine the significance of this acknowledgement by the Defendant in evaluating Dr. Frumkin's conclusions.

A. According to this, yes.

Q. Consistent with what that Miranda right is designed to protect, your right to remain silent; right?

A. Yes.

Q. Does that suggest to you, Doctor, that once he [was] read his rights he knew, at the very least, he could stop talking, on that day?

A. I don't—I can't answer that. I don't know the conditions on which this declaration was written. I know when declarations are written, oftentimes an attorney is involved in helping that person come up with the declaration. I know—

Q. Doctor. Doctor. Let's assume for the moment that the sworn statement of the Defendant is true. Does it—so assuming that the sworn statement is true, does that mean once he read his rights, he knew, at the very least, he could stop talking? That's his—that's his own words, assuming it's true; right?

A. Assuming it's true, then, of course, that would mean that he understood that right.

Q. So, yes or no, Doctor; knowing this now, does this at all change your assessment as to the Defendant's truthfulness when he met with you?

A. No, it can't change, because also being mistaken is being different than whether you're telling the truth or not, and I don't know the conditions under which this was written.

Q. Okay.

A. I know that declarations from a lot of legal cases, including when I've had legal issues or whatever, I may write some sort of declaration, but the attorneys then revise it in ways that you, make more sense or whatever. I know that he's not capable—I know, with certainty, he's not capable of writing it in this integrated fashion in English, I know that.[11]

(Hr'g Tr. 295:20–297:10, ECF No. 155.)

---

[11] It is worth noting that Dr. Frumkin accepted as true the Defendant's statements during his interview of the Defendant and the Defendant's answers to the test questions yet was openly skeptical of the validity of the Defendant's sworn statements. This too, undermines Dr. Frumkin's credibility.

In sum, rather than reconcile the Defendant's statement with his own conclusions, Dr. Frumkin offered his purely speculative opinion that the declaration is not a reliable source of information regarding the Defendant's capacity to understand or act on *Miranda* warnings. And although the Court trusts that Dr. Frumkin holds a good-faith belief in his testing methods and results, Dr. Frumkin accepted as accurate the Defendant's statements during the interview, to include Defendant's presentation regarding his English speaking abilities, even though the Defendant knew the purpose of the interview and the hearing on the motion to suppress had already commenced; dismissed identifiable indications that the Defendant might be exaggerating his deficiencies or malingering; gave no weight to the hearing transcripts or the testimony of SA Coletti or SA Keczemethy; and dismissed the import of the Defendant's own sworn declarations because he did not know its genesis.[12] For these reasons, his conclusions are rejected.

Ultimately, it is this Court's obligation to consider all of the evidence and determine, based upon the totality of the circumstances, whether the Defendant understood and knowingly waived his *Miranda* rights. *See United States v. Male Juvenile*, 121 F.3d 34, 40 (2d Cir. 1997). The record in this case reveals that the Defendant repeatedly and expressly represented that he understood his rights, outwardly appeared to understand his rights, and claims to have acted in accordance with that understanding. Based on the entire record, the Court finds that the Government has met its burden to prove, by a ponderance of the evidence, that the Defendant's waiver was knowingly, intelligently and voluntarily provided.

**Conclusion**

For the foregoing reasons, the Defendant's motion to suppress is denied in its entirety.

---

[12] The Court finds it notable that the Defendant has never recanted or recast these declarations, and indeed, relies upon them in his opening argument that he was not given his *Miranda* warnings in advance of the interrogation.

**SO ORDERED** at Bridgeport, Connecticut, this 7th day of January 2022.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE